UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

RODOLPH J. LANAGHAN,

        Plaintiff,

  v.                                             Case No. 15-C-929

CO KOCH, et al.,

        Defendants.

---

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

---

On August 3, 2015, Plaintiff Rodolph Lanaghan filed a *pro se* civil rights action alleging that Defendants CO II Koch, Sergeant Chase, Nurse Woomer, Nurse Bowen, and unknown Health Service Unit staff violated his Eighth Amendment rights while he was an inmate serving a sentence at the Oshkosh Correctional Institution (OSCI). Lanaghan alleged that Defendants were deliberately indifferent to his serious medical needs and were negligent regarding his Dermatomyositis with Polymyositis, a severe muscle disease. On January 6, 2017, the court held a *Pavey* hearing on the issue of whether Lanaghan had exhausted his administrative remedies prior to commencing his federal lawsuit. *See Pavey v. Conley*, 544 F.3d 739 (7th Cir. 2008). The court finds from the testimony and evidence presented at the hearing that Lanaghan failed to exhaust his administrative remedies.

### BACKGROUND

At the *Pavey* hearing, Lanaghan testified on his own behalf and also presented testimony from Audie Draper, an OSCI inmate during the relevant time period. The defendants produced three

witnesses: Officer Darryl Koch, Lieutenant James Chase, and Theresa Murphy, an institutional complaint examiner. The Court will first summarize the evidence presented and then set forth its findings of fact.

Lanaghan testified that he first began experiencing symptoms of what would be diagnosed as Dermatomyositis with Polymyositis in early November 2011. He noticed his scalp was inflamed and itched, his ab muscles and back muscles hurt, and his ears were red and inflamed. Over the next two weeks, Lanaghan's symptoms grew worse. His head was full of sores that were bleeding, pussing, and scabbing down to his forehead. He had spots and scabs around his eyes, his ears cauliflowered and were bleeding and pussing, and a lump formed on the back of his neck. Though the pain had spread throughout his entire body, it was most severe in his ab and back muscles. The pain made it difficult to sit, stand, and walk. On November 20, 2011, Lanaghan submitted his first request to OSCI's Health Services Unit (HSU) to address his condition. (Ex. 1007 at 1.) In his request, he described having a lump on the back of his neck, a rash on his face and ears, sores on his head, sore stomach and back muscles, and spots around his eyes. (*Id.*) He indicated that these symptoms started around the same time. (*Id.*)

Lanaghan reported to HSU for treatment on November 21, 2011. He testified that Nurse Woomer's examination concentrated solely on his rash. Although he tried to explain his other symptoms, she indicated she was only ordered to see him for the rash. Nurse Woomer gave him hydrocortisone cream to treat it. On November 23, 2011, Lanaghan received treatment from Dr. Murphy for the rash on his face. He submitted two more HSU requests on November 28, 2011, reporting a large, swollen bulge on his back. (*Id.* at 2–3.) Lanaghan received further treatment from HSU on November 29, November 30, December 1, and December 3. During this time, he began to

2

have difficulty performing his own activities of daily living. He relied on other inmates to brush his teeth, wash his face, comb his hair, help him eat, and even help him on and off the toilet. Lanaghan testified that he sat in the dayroom crying because he was in so much pain.

On December 6, 2011, Lanaghan was rushed to the hospital and ultimately diagnosed with Dermatomyositis with Polymyositis, a rare muscle disease. He returned to OSCI approximately one week later with medication and treatment instructions. Upon his return, his symptoms reappeared instantly. Audie Draper testified that Lanaghan's disease "progressed into something so unbelievably horrible." The rash spread throughout his entire body, and the bleeding and pussing sores appeared on his ears and head. His muscles, including his swallow muscles, began shutting down, causing him to drown in his own saliva. He was no longer eating or sleeping. Lanaghan's pain was so severe that he was confined to a wheelchair. He could not sit up, lay down, or move.

Lanaghan testified that he first considered filing an inmate complaint form on December 20, 2011 to address the inadequate treatment he received for his condition. At that time, he could no longer write, so he asked Draper for help drafting and filing a grievance. Draper wheeled Lanaghan to OSCI's dayroom, the spot where inmates could freely congregate, to write the complaint. When they arrived to the dayroom, all of the recreational tables were occupied by other inmates. Lanaghan asked Officer Koch if Draper could help him write an inmate complaint at a vacant table in the study room. Officer Koch told them they could not use a study table. Draper asked Lieutenant Chase to countermand Officer Koch's directive. Lieutenant Chase told them they could not use a study table to write the inmate complaint because study tables could only be used for studying. Lieutenant Chase referenced the Open Center Handbook specific to the E building, where Lanaghan and Draper were housed, which states: "tables in end dayrooms are for studying only with staff permission."

3

(Ex. 1020 at 4.) Each inmate in the unit received a copy of the handbook and several were available at the front desk in the dayroom for inmates to checkout. Lanaghan and Draper acknowledged that while the written rule is that study tables are only to be used for studying, some correctional officers were often lenient with the rule.

Lanaghan testified that after his attempt to file an inmate complaint was thwarted by Officer Koch and Lieutenant Chase, he spent the next week trapped inside his own body, believing he was going to die. On December 28, 2011, Lanaghan was hospitalized a second time for approximately two months. After his hospitalization, he spent two weeks at the Dodge Infirmary performing physical therapy. Lanaghan returned to OSCI in March 2012. He testified that he was weak and walked with a cane but was able to function. He promptly resumed his employment with Badger State Industries as a laundry sorter.

Lanaghan did not immediately file a grievance regarding the improper treatment of his condition when he returned to OSCI. Instead, he filed an inmate complaint on July 2, 2012. He listed the date of incident as "11-20-11 to present (on-going)." (Ex. 1001 at 8.) Theresa Murphy, an institutional complaint examiner, rejected the complaint on July 10, 2012 because it was untimely. (*Id.* at 2.) She testified that there would have been good cause to extend Lanaghan's time to file a grievance until March 2012 but not to July, months after he returned from the hospital. She determined that Lanaghan would have been capable of filing an inmate complaint in March because he worked, lived in general population, and went to canteen. Lanaghan had also filed four other inmate complaints unrelated to his medical treatment between the time he returned to OSCI in March and the time he filed his complaint on July 2, 2012. (Ex. 1000.) Lanaghan requested review of the rejected grievance on July 17, 2012, and his request was denied on August 2, 2012.

4

## FINDINGS AS TO EXHAUSTION OF REMEDIES

As an inmate, Lanaghan is subject to the Prison Litigation Reform Act (PLRA). The PLRA provides that a prisoner cannot assert a cause of action under federal law "until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Woodford v. Ngo*, 548 U.S. 81, 93 (2006) (holding that the PLRA requires proper exhaustion of administrative remedies). The objective of § 1997e(a) is to "permit the prison's administrative process to run its course before litigation begins." *Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006) (quoting *Cannon v. Washington*, 418 F.3d 714, 719 (7th Cir. 2005)). The Seventh Circuit applies a "strict compliance approach to exhaustion" and expects prisoners to adhere to "the specific procedures and deadlines established by the prison's policy." *Dole*, 438 F.3d at 809.

Wisconsin Administrative Code Chapter DOC 310 governs Wisconsin's inmate complaint review system (ICRS). The ICRS allows inmates to "raise significant issues regarding rules, living conditions, staff actions affecting institution environment, and civil rights complaints." Wis. Admin. Code § DOC 310.08(1). An inmate must file a complaint with the institutional complaint examiner (ICE) within 14 calendar days after the occurrence giving rise to the complaint, unless good cause exists to excuse a delay. § DOC 310.09(6). The inmate must file a signed complaint by either depositing it in a locked box designated for inmate complaints or by submitting it to the ICE through institution mail. § DOC 310.09(8). The ICE has the authority to return, investigate, or recommend a decision to an appropriate reviewing authority. § DOC 310.07(2)(a)–(c). If a reviewing authority renders a decision, the inmate may appeal that decision to the Corrections Complaint Examiner (CCE) within 10 calendar days. § DOC 310.13(1). After receiving an appeal, the CCE shall issue a written receipt of the appeal to the inmate within five working days, then recommend a decision

5

to the DOC Secretary, who adopts or rejects the recommendation. §§ DOC 310.13(4), DOC 310.14(2). The failure to properly exhaust each step of the grievance process constitutes failure to exhaust available administrative remedies. *See Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002) ("To exhaust remedies, a prisoner must file complaints and appeals in the place, and at the time, the prison's administrative rules require.").

An inmate's claim is not subject to the PLRA exhaustion requirement, however, when no administrative remedies are "available" to him during the relevant exhaustion period. *Hernandez v. Dart*, 814 F.3d 836, 842 (7th Cir. 2016) (citing 42 U.S.C. § 1997e(a); *Woodford*, 548 U.S. at 93). Prison authorities cannot "immunize themselves from suit by establishing procedures that in practice are not available because they are impossible to comply with or simply do not exist." *King v. McCarty*, 781 F.3d 889, 894 (7th Cir. 2015). Exhaustion is an affirmative defense, and so the defendants must establish that an administrative remedy was available and that Lanaghan failed to pursue it. *See Thomas v. Reese*, 787 F.3d 845, 847 (7th Cir. 2016).

It is undisputed that Lanaghan did not file a prisoner complaint, the available administrative remedy, until July 2, 2012. Lanaghan argues that the grievance process was not available to him within the meaning of the PLRA because (1) Officer Koch and Lieutenant Chase prevented him from filing a grievance and (2) he was physically unable to draft and file a grievance within the 14-day period required by Wis. Admin. Code § DOC 310.09(6).

Lanaghan argues that Officer Koch and Lieutenant Chase prevented him from filing an inmate complaint on December 20, 2011 when they refused to let him draft his complaint at a study table with Draper. When prison officials prevent an inmate from using the administrative process, "the process that exists on paper becomes unavailable in reality." *Kaba v. Stepp*, 458 F.3d 678, 684 (7th

6

Cir. 2006). A remedy becomes unavailable to an inmate if "prison employees do not respond to a properly filed grievance or otherwise use affirmative misconduct to prevent a prisoner from exhausting." *Dole*, 438 F.3d at 809 (citations omitted); *see also Thomas*, 787 F.3d at 847 (administrative remedies were unavailable because a correctional officer misled a prisoner into believing he could not file a grievance when in fact he could); *Dale v. Lappin*, 376 F.3d 652, 656 (7th Cir. 2004) (administrative remedies were unavailable to an inmate who was told numerous times by prison staff that he could not have a grievance form).

Here, Officer Koch and Lieutenant Chase, neither of whom could recall the incident, did not use affirmative misconduct to prevent Lanaghan from exhausting his administrative remedies, even by Lanaghan's account. They neither provided Lanaghan with improper information about the grievance process nor denied him access to complaint forms. Officer Koch and Lieutenant Chase did not prevent Lanaghan from using the grievance process—they merely denied Lanaghan and Draper's requests to use a study table for purposes other than studying, in accordance with the Open Center Handbook. Even so, the study tables were not the only place Lanaghan could write his grievance. The dayroom also contained tables for recreational use that happened to be occupied at the time Lanaghan set out to draft his complaint. Rather than wait for a recreational table to become available, Lanaghan returned to his cell. In short, Lanaghan has not established that his administrative remedies were unavailable to him because prison officials denied him access to the grievance process.

Lanaghan also asserts that administrative remedies were unavailable to him because he was physically unable to exhaust them within the 14-day period before his second hospitalization. But that does not explain why he failed to file when he returned to OSCI in March 2012. Under the

7

administrative code, "[a]n inmate shall file a complaint within 14 calendar days after the occurrence giving rise to the complaint, except that the institution complaint examiner may accept a late complaint for good cause." Wis. Admin. Code § DOC 310.09(6). Even assuming Lanaghan was not physically able to draft an inmate complaint before December 28, 2011, there was nothing to prevent him from filing the grievance immediately after he returned.

Lanaghan argues that he did not immediately file a grievance when he returned to OSCI because the 14-day period expired, and he did not know that he could file an inmate complaint late. Yet, he obviously knew by the time he finally did file on July 2, 2012, that filing late could be excused for good cause. He tried to take advantage of the good cause exception by beginning his complaint with the following allegation: "Pursuant to the authority in DOC 310, based on fears of staff retaliation and the clear pattern of negligent, malicious, and/or indifferent conduct by medical and security staff, I am requesting that the ICE waive the 14 day limit for filing based on 'good cause.'" (Ex. 1001 at 8.) Good cause was not found, and on July 10, 2012, ICE Murphy rejected Lanaghan's complaint because it was filed beyond the 14–calendar day limit. (*Id.* at 2.) She testified that there would have been good cause to accept the grievance had he filed it in March when he returned from the hospital, but there was no reason to extend the time to file an inmate complaint to July. The court agrees. While physical incapacitation is "good cause" for an untimely filing, an inmate is still required to file the grievance "as soon as it [is] reasonably possible for him to do so." *Hurst v. Hantke*, 634 F.3d 409, 412 (7th Cir. 2011); *see also Hernandez*, 814 F.3d at 843 (once he was discharged from the hospital, the inmate was required to file an inmate complaint within the time period allowed under the grievance procedures).

Indeed, by his account, Lanaghan's condition was devastating prior to his hospitalization, but by March 2012, he had improved. Lanaghan testified that once he returned to OSCI, he was weak and walked with a cane but was able to function. He immediately returned to his job as a laundry sorter with Badger State Industries, ordered from canteen on a regular basis, lived in general population, and filed other inmate complaints. (Ex. 1001.) Based on his own testimony and all of the foregoing evidence, the court finds that Lanaghan was able to file an inmate complaint regarding the inadequate treatment he received for his medical condition months before July 2, 2012. In sum, Lanaghan did not file an inmate complaint within the 14-day time period as required by Wis. Admin. Code § DOC 310.09(6) or within a reasonable time after his physical condition allowed him to do so. Accordingly, he failed to exhaust his administrative remedies before commencing this civil rights lawsuit.

## CONCLUSION

For the foregoing reasons, Defendants have proven by a preponderance of the evidence that Lanaghan failed to exhaust his administrative remedies. Therefore, Lanaghan's case is hereby **DISMISSED**. The Clerk is directed to enter judgment in favor of the defendants forthwith.

**SO ORDERED** this   30th   day of January, 2017.

s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court